IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Case No. 07-cv-01844-PAB-KLM
(*consolidated with 07-cv-02248-PAB-BNB*)

WENDY WILSON, as an individual and as the next of kin and personal representative of Ryan Wilson, deceased, et al.,

    Plaintiffs,

v.

CITY OF LAFAYETTE, et al.,

    Defendants.

_____

**ORDER**
_____

This case arises out of the death of Ryan Wilson after a police pursuit. The pursuit ended when a police officer shot Mr. Wilson with a TASER and, shortly thereafter, Mr. Wilson died. In support of their claims against defendants City of Lafayette, Lafayette Police Department, and Lafayette Police Officer John Harris, plaintiffs seek to introduce expert testimony by Rodger Kram, Ph.D. Officer Harris, joined by the other defendants, asks the Court to exclude that testimony pursuant to Federal Rule of Evidence 702 ("Harris' Rule 702 Mot.") [Docket No. 144]. The motion is fully briefed and ripe for disposition.

**I. BACKGROUND**

On August 4, 2006, Ryan Wilson was approached by two undercover officers from the Boulder County Drug Task Force in a field in Louisville, Colorado. Upon

realizing that he was speaking to police officers, Mr. Wilson fled. The officers chased him for approximately three-quarters of a mile across rough terrain and multiple fences. Officer John Harris arrived by police vehicle during the pursuit and quickly identified Mr. Wilson from a description he received from the other officers. He also began pursuing Mr. Wilson by foot. Mr. Wilson then approached another fence. There is a dispute regarding Mr. Wilson's precise movements at this point, i.e., whether Mr. Wilson stopped, turned to face Officer Harris, and turned to flee again or whether Mr. Wilson simply slowed down as he approached the fence. Officer Harris has testified that Mr. Wilson, while running, turned to his left on more than one occasion to look in Officer Harris' direction. Furthermore, Officer Harris has stated that Mr. Wilson reached down and placed his hand on what appeared to be a knife clipped inside his right-hand pocket while the foot chase was ongoing. In any event, at this stage of the encounter, Officer Harris discharged an X26 model TASER device at Mr. Wilson.

When the trigger on a TASER is pressed, the TASER discharges two probes connected to the device by wires. If both probes lodge in the skin or clothing of the person targeted, an electrical current flows between the two probes. This current will override the target's central nervous system and cause a loss of muscle control. There is no dispute that one of the TASER probes hit and secured itself to Mr. Wilson's left side. While there is some dispute regarding whether and where the second probe hit, Officer Harris, on at least one occasion, has stated that the second TASER probe struck Mr. Wilson in the back of his head. *See* Ex. A-6 to Harris' Reply [Docket No. 203-3] at 14. In any case, at the same time Officer Harris shot Mr. Wilson with the TASER, Mr. Wilson immediately fell to the ground, face down, and was unresponsive to

Officer Harris' commands.

At the time Officer Harris discharged his TASER, the other police officers in the area were farther away from Mr. Wilson than Officer Harris. Sergeant Lanphere stated that he was "within less than 25 yards" at the time the TASER was discharged. Ex. A-7 to Harris' Reply at 34. Detective Benjamin Kurtz estimated that he was between 75 and 100 yards away and could not see Mr. Wilson because Officer Harris' body obstructed his view. Ex. A-8 to Harris' Reply at 31-32 ("[T]hey were both running in the same direction in my line of path, so their outlines were on top of each other."). Detective Robert Vesco also testified to being 75 to 100 yards away and that he did not see Mr. Wilson face Officer Harris or reach for his pocket because the police truck obscured his view. Ex. A-9 to Harris' Reply at 203-6.

Plaintiffs now seek to introduce the expert testimony of Rodger Kram, Ph.D., to support the contention that, had Mr. Wilson moved the way Officer Harris described, the other officers would have witnessed it and that the TASER probes would not have made contact with Mr. Wilson as indicated by the other evidence in the case. Officer Harris has moved to exclude Dr. Kram's testimony pursuant to Federal Rule of Evidence 702.

## II. FEDERAL RULE OF EVIDENCE 702

Federal Rule of Evidence 702 provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As the rule makes clear, while required, it is not sufficient, that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area. Rather, the Court must "perform[] a two-step analysis." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After "determin[ing] whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render an opinion," *id.* (quoting Fed. R. Evid. 702), the specific proffered opinions must be assessed for reliability. *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based upon sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods . . . to the facts of the case").

Rule 702 "imposes on the district court a gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). To execute that function, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). When assessing reliability, "the court may consider several nondispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *103 Investors I*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at

593-94). These considerations are not exhaustive. Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of any expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

While plaintiffs, as the proponents of the challenged testimony, have the burden of establishing admissibility, their proffer is tested against the standard of reliability, not correctness; they need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008).

In sum, expert testimony must be excluded if the expert is unqualified to render an opinion of the type proffered, if the opinion is unreliable, if the opinion will not assist the trier of fact, or if the opinion is irrelevant to a material issue in the case.

### III. DISCUSSION

In his expert report, Dr. Kram answered the following three questions:

1. Can one easily observe that a runner's arm movements change if the runner reaches for their [sic] right pants pocket (and if so, from what angles)?

2. Are the descriptions and movements of Mr. Wilson during the foot pursuit as described by Officer Harris consistent with what I consider to be a person's "natural inclination" in terms of biomechanics?

      3.      How did the kinematics of the foot pursuit as described by Officer Harris affect the potential threat posed by Mr. Wilson, assuming he had a knife in his pants pocket?

Ex. A-1 to Harris' Rule 702 Mot. at 1.  The Court will not permit Dr. Kram to offer his answers to any of these questions.

### A.  Opinion One

Dr. Kram's answer to the first question is as follows: "To examine this question, I simply observed a subject running on a treadmill while I moved 360 degrees around the subject.  At all angles, it was clear when the runner transitioned from normal arm movements to reaching for their [sic] right pants pocket."  Ex. A-1 to Harris' Rule 702 Mot. at 1.  Plaintiffs offer this opinion in order to support the argument that the other officers would have seen Mr. Wilson reach for his right pocket if he had actually done so.

Dr. Kram is an associate professor in the Department of Integrative Physiology at the University of Colorado in Boulder, Colorado.  Ex. 1 to Pls.' Response to Harris' Rule 702 Mot. [Docket No. 181-2] at 1.  He has "25 years of experience in human anatomy, physiology and biomechanics (i.e. motion and forces) of locomotion (walking and running)."  Ex. A-1 to Harris' Rule 702 Mot. at 1.  It is not clear, however, how his qualifications are relevant to his opinion.  Nothing about Dr. Kram's observations is linked to training in "biomechanics, running, and human movement."  Pls.' Response at 6.  If the opinion does not require any specific expertise, the opinion is nothing more than the observations of an individual being offered to refute the testimony of the police

officers regarding what they were able to see under decidedly different circumstances.[1]

It is these decidedly different circumstances which call into question the reliability of Dr. Kram's methodology. Dr. Kram explained during his deposition that the farthest he was away from the subject on the treadmill was 20 feet.[2] The officers other than Harris were anywhere from "within less than 25 yards" to as many as 100 yards away from Officer Harris and Mr. Wilson. Yet, even in the controlled environment of the experiment, Dr. Kram did not seek to determine at what distance such movements would become less clear. *See* Ex. A-2 to Harris' Mot. at 52. He did, however, admit that there would be a distance at which that would be the case. *Id.* at 51. The experiment, in other words, was not applied to the issue here, i.e., whether those farther away than Officer Harris would be expected to have seen what Officer Harris testifies to having seen. *See id.* at 52 ("And certainly in the distances that were relevant to what Officer Harris could see as described, it was well within that range. But perhaps Officer Lanphere, who was quite a distance away, I can't say. I didn't evaluate that.").

In short, Dr. Kram's experiment would appear to do nothing other than possibly corroborate that Officer Harris could have seen what he claims. It is not, however, even reliable expert evidence on that point, assuming plaintiffs would have any reason to proffer it. The methodology supports only a very limited reliable conclusion, but one not relevant to the facts of this case. Dr. Kram's experiment took place indoors, while the

---

[1]Dr. Kram did not have other people observe the runner to determine what they saw from different distances and angles because he "felt it was plainly obvious." Ex. A-2 to Harris' Mot. at 50.

[2]This maximum distance is an estimate. Dr. Kram did not measure the distance from which he made his observations. *See* Ex. A-2 to Harris' Mot. at 50.

events here were outdoors. Dr. Kram's subject ran on a treadmill, while Officer Harris, the other police officers, and Mr. Wilson were moving across rough terrain. There were no noted obstructions to Dr. Kram's view, while obstructions were noted by the two detectives who were between 75 to 100 yards away. Furthermore, there is no indication in the report regarding Dr. Kram's eyesight in relation to the officers', nor regarding the height, weight, running style, method of reaching, or other unique characteristics of the subject in his study in relation to what is known about Mr. Wilson. These differences do not simply go to the weight of Dr. Kram's opinion but undermine its overall reliability as applied to this case. The methodology employed supports an inference going no further than what a person trained in physiology and biomechanics can clearly see, when looking for that very thing, from no farther than 20 feet away indoors.

In fact, Dr. Kram does not even attempt to apply the methodology to the facts of this case. Plaintiffs are simply attempting to offer testimony that Dr. Kram saw arm movement in one situation to support the conclusion that others would have seen arm movement under materially different circumstances without any explanation of how that correlation can reliably be made. Therefore, Dr. Kram's answer to the first question will be excluded.

### B. Opinion Two

As noted above, the second question posed to Dr. Kram was "[a]re the descriptions and movements of Mr. Wilson during the foot pursuit as described by Officer Harris consistent with what I consider to be a person's "natural inclination" in terms of biomechanics?" His answer was as follows:

> One particular aspect of the movements of Mr. Wilson as described by Officer Harris intrigued me. The description includes that while being pursued from his right side, Mr. Wilson allegedly turned to his left. I investigated this by trying to replicate the movements myself and by observing my students and colleagues when I asked them to perform the same actions. It is indeed awkward to rotate significantly in the described manner while sprinting.
>
> Note: in the following description, I arbitrarily chose north as the facing direction for convenience, but that is not the direction during the described pursuit. During standing a person can rotate about a vertical axis such that [sic] their axilla (arm pit) by about 90 degrees, i.e., while standing facing north, a person can rotate their [sic] torso such that their [sic] left side is pointing south. The neck provides more degrees of movement and the eyes can rotate in their sockets so that a person can gaze to the south east, despite standing with the feet pointing due north. While these rotations are easy during standing, they are substantially more difficult to perform while running.
>
> The limited rotation of the torso presents some questions about the accuracy of the description of the pursuit of Officer Harris when combined with the Taser marks on the left side of Mr. Wilson. I am not an expert on ballistics, but I do not see how a Taser probe fired from behind and right side of a person would lodge on the left side of the body just under the armpit. Further, if the second Taser probe lodged in the back of Mr. Wilson's head, that angle formed by the two probes implies very awkward rotations of the wrists of Officer Harris. Based on anatomy, biomechanics and the physical evidence, it is much more likely that the Taser was deployed by a person located on the left side of Mr. Wilson.

Ex. A-1 to Harris' Rule 702 Mot. at 1-2. In support of the admissibility of this opinion, plaintiffs do nothing more than point to the general subject areas of Dr. Kram's expertise. Yet, there is no explanation, either in Dr. Kram's report or elsewhere, of how that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

Dr. Kram assumed that the description of Mr. Wilson turning to his left while being pursued from behind and to the right meant that Mr. Wilson turned only the upper portion of his body. If a jury were to determine that was what occurred, it would be

9

relevant to determine the probability that Mr. Wilson would have turned in such a manner and have been hit with the TASER probes in the places alleged.  But Dr. Kram's testimony does not provide them with any assistance in doing so.  His opinion that it is awkward to rotate the top half of one's body and, looking over one's left shoulder, to peer at someone chasing one from behind and to the right is based on nothing more than Dr. Kram attempting it himself and asking others to do the same.  The Court has not been supplied with any explanation of a methodology or base of knowledge requiring expert opinion to assist the jury in understanding this point.  All the Court knows is that it felt awkward to Dr. Kram, and to a certain undefined number of others, to rotate their bodies in this way.

Furthermore, to the extent Dr. Kram is offering an opinion on the likelihood of the probes hitting Mr. Wilson in the locations described, that opinion appears to be based on application of common knowledge regarding the human anatomy to supposition regarding the ballistics of a TASER probe.[3]  Dr. Kram's answer to the second question will be excluded.

### C.  Opinion Three

Dr. Kram also answered the following question: "How did the kinematics of the foot pursuit as described by Officer Harris affect the potential threat posed by Mr. Wilson, assuming he had a knife in his pants pocket?"  The core opinion offered by Dr. Kram in answering that question is that "due to the fatigue [of Mr. Wilson] and other

---

[3]This application is insufficiently reliable as well.  Dr. Kram does not address why Mr. Wilson's left side could not have been facing Officer Harris while his head was turning away, i.e, that it would be possible for the back of Mr. Wilson's head and his left side to be facing the same direction.

factors (i.e. the pursuit was in an open field), Officer Harris had control over both the speed of the chase and the gap between himself and Mr. Wilson. Rather than taking tactical advantage of Mr. Wilson's fatigue, Officer Harris elected to use tactics that raised the risk to his own safety and precipitated the 'fear for his life' situation."

This opinion is offered in the context of Officer Harris' testimony that he stayed between ten to fifteen feet behind Mr. Wilson while chasing him. Dr. Kram, in preparing his report, watched part of a police training video describing the "21 foot rule." As Dr. Kram understood that rule, twenty-one feet is considered a sufficient distance to keep between oneself, as a police officer, and a suspect armed with a knife so as to provide sufficient time to un-holster and fire a weapon in defense against an attack. His opinion regarding the conduct of Officer Harris, therefore, relates to his understanding of the approach Officer Harris should have taken while pursuing Mr. Wilson. Dr. Kram, by his own admission, is unqualified to render such an opinion. *See, e.g.*, Ex. A-2 to Harris' Rule 702 Mot. at 24 (testifying that he couldn't say whether it was "always possible or practical" to maintain a distance of twenty-one feet because he has no "police experience"). He has no training, experience, or education in police tactics and the use of force.

Therefore, all that remains of his third opinion are calculations regarding how the distance between Officer Harris could have been altered. In other words, Dr. Kram estimates a speed at which Officer Harris and Mr. Wilson were running. He then explains how the distance between the two would change if one or both stopped or slowed down. Regardless of the accuracy of the estimate or of the resulting calculations, Dr. Kram's expert testimony essentially consists of the unremarkable

statement that Officer Harris could have kept a distance of more than 21 feet behind Mr. Wilson if he had so chosen.[4]  Expert testimony is not necessary to assist the jury in understanding something so obvious.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant Lafayette Police Officer John Harris' Rule 702 motion to preclude the testimony of plaintiffs' expert witness Rodger Kram [Docket No. 144] is GRANTED.

DATED February 24, 2010.

                                                    BY THE COURT:

                                                    s/Philip A. Brimmer
                                                    PHILIP A. BRIMMER
                                                    United States District Judge

---

[4] Plaintiffs framed his opinion as follows: "Dr. Kram never claimed to have 'expertise' regarding the 21-foot rule.  Rather, he used the scientific principles of running, velocity and deceleration to opine that it was within Officer Harris' control as the pursuer to determine how close or far he was from a suspect believed to have a knife, and that running speed could quickly lengthen the gap to a safe distance of 21 feet or more if he was fearful of his life."  Pls.' Response at 15.

12