IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**


Civil Case No. 07-cv-01844-PAB-KLM
 (*consolidated with 07-cv-02248-PAB-BNB*)

WENDY WILSON, as an individual and as the next of kin and personal representative
of Ryan Wilson, deceased, et al.,

 Plaintiffs,

v.

CITY OF LAFAYETTE, et al.,

 Defendants.

_____

**ORDER DENYING DEFENDANT TASER'S
MOTION FOR SUMMARY JUDGMENT**
_____

 This case arises out of the death of Ryan Wilson after a police pursuit. The

pursuit ended when a police officer shot Mr. Wilson with a TASER and, shortly

thereafter, Mr. Wilson died. Defendant Taser International, Inc. ("Taser"), the

manufacturer of the TASER, seeks summary judgment [Docket No. 123] on plaintiffs'

claims against it. Its motion is fully briefed and ripe for disposition.

**I. BACKGROUND**

 On August 4, 2006, two undercover officers from the Boulder County Drug Task

Force were conducting surveillance on a crop of marijuana in a field in Louisville,

Colorado. The officers approached Ryan Wilson and began talking to him. Upon

realizing that he was speaking to police officers, Mr. Wilson fled. The officers chased

him for approximately three-quarters of a mile across rough terrain and multiple fences.[1]

Officer John Harris arrived by police vehicle during the pursuit and identified Mr. Wilson

from a description he received from the other officers.  He also began pursuing Mr.

Wilson by foot.  Mr. Wilson then approached another fence.  There is a dispute

regarding whether Mr. Wilson stopped, turned to face Officer Harris, and turned to flee

again or whether Mr. Wilson simply slowed down as he approached the fence.  In any

event, at this stage of the encounter, Officer Harris discharged an X26 model TASER

device at Mr. Wilson.

When the trigger on a TASER is pressed, the TASER fires two probes

connected by wires.  If both probes lodge in the skin or clothing of the person targeted,

an electrical current will flow between the two probes.  This current will override the

target's central nervous system and cause loss of muscle control.  More specifically, the

X26 device uses what is called a Shaped Pulse, which has two phases:

> The first phase, called the "Arc Phase" is optimized to generate a very high
> voltage to penetrate clothing, skin or other barriers.  The "Arc Phase" is a
> very high voltage short duration pulse that can arc through up to 2 inches of
> clothing or barriers.  Once the arc is created, the air in the arc is ionized and
> becomes a low impedance electrical conductor that conducts the second
> pulse phase into the body.
>
> The second phase of the Shaped Pulse is the stimulation phase, or "Stim
> Phase."  The Stim Phase does not have to arc across a barrier, since this
> was accomplished by the Arc Phase.  The Stim [P]hase only has to flow
> across the highly conductive arc from the Arc Phase. Hence, the Stim Phase
> is optimized to provide maximum incapacitation for a human target while
> operating at super-efficient power levels.

------------------------

[1]Many of the details surrounding the encounter between Mr. Wilson and the
police, while relevant to other issues in this case, are largely immaterial to the instant
motion.

Ex. A-30 ("X26 Operating Manual") to Taser's Mot. [Docket No. 129-7] at 4.

There is no dispute that one of the TASER probes hit and secured itself to Mr. Wilson's left side. While there is some dispute regarding whether and where the second probe hit, there is evidence that it may have struck Mr. Wilson in the back of the head or neck and that an electrical current flowed between the two probes.

At the same time Officer Harris shot Mr. Wilson with the TASER, Mr. Wilson immediately fell to the ground, face down, and was unresponsive to Officer Harris' commands. Upon reaching Mr. Wilson, the pursuing officers turned him over and detected breathing and a pulse. Between ten seconds and a minute later, however, Mr. Wilson stopped breathing, and the officers could no longer detect a pulse. The officers' attempts to resuscitate him failed. An autopsy showed that Mr. Wilson suffered from hypoplastic coronary artery disease and myocardial bridging near his heart.

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56(c) when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.

*Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

## III.  DISCUSSION

Plaintiffs assert product liability claims against Taser sounding in negligence and strict liability in this diversity action governed by Colorado law.  "[S]trict liability and negligence are conceptually different theories of product liability."  *Perlmutter v. U.S. Gypsum Co.*, 54 F.3d 659, 663 (10th Cir. 1995) (citing *Grasmick v. Otis Elevator Co.*, 817 F.2d 88, 90 (10th Cir. 1987) (applying Colorado law)).  "'The difference between negligence and strict liability is the focus of the trier of fact.  Under a negligence theory, the reasonableness of the manufacturer's conduct must be determined. Under a strict liability theory, the determination is whether the product is defective, or, if not defective, unreasonably unsafe, and whether ... a warning was required.'"  *Id.* (quoting *Downing v. Overhead Door Corp.,* 707 P.2d 1027, 1032 (Colo. App. 1985)).[2]  Taser argues that, regardless of the theory of liability, plaintiffs have failed to establish that there was a

---

[2]*See Boles v. Sun Ergoline, Inc.*, 223 P.3d 724, 726-27 (Colo. 2010) (citations omitted):

> "Strict products liability" has been described as a "term of art that reflects the judgment that products liability is a discrete area of tort law which borrows from both negligence and warranty" but "is not fully congruent with classical tort or contract law."  Rather than resting on negligence principles, it "is premised on the concept of enterprise liability for casting a defective product into the stream of commerce."  In strict products liability, the focus is on the nature of the product rather than the conduct of either the manufacturer or the person injured.

defect or that the defect caused the harm. *See* Restatement (Second) of Torts §

402A.[3]  In response to Taser's motion, plaintiffs appear to accept that, for purposes of

resolving this motion, the analysis is the same regardless of the theory of liability.[4]  The

Court turns first to the parties' disputes regarding causation.

### A. Causation

Plaintiffs' claims are based on the premise that both TASER probes connected

with Mr. Wilson, that an electrical charge flowed between them, and that Mr. Wilson

died as a result. Taser argues that "there is *no* evidence that the TASER Device

properly connected to Wilson to deliver electricity to his body." Taser's Mot. at 22

(emphasis added). However, in what appears to be an attempt to have its cake and eat

it too, Taser also argues that the "Device functioned as intended, as it immediately

---

[3]"In determining the extent of liability of a product manufacturer for a defective
product, [the Colorado Supreme Court] has adopted the doctrine of strict products
liability set forth in the Restatement (Second) of Torts § 402A (1965)." *Camacho v.
Honda Motor Co., Ltd.*, 741 P.2d 1240, 1244 (Colo. 1987). Section 402A of the
Restatement (Second) of Torts provides that:

> (1) One who sells any product in a defective condition unreasonably
> dangerous to the user or consumer or to his property is subject to liability for
> physical harm thereby caused to the ultimate user or consumer, or to his
> property, if
>> (a) the seller is engaged in the business of selling such a product, and
>> (b) it is expected to and does reach the user or consumer without
>> substantial change in the condition in which it is sold.
> (2) The rule stated in Subsection (1) applies although
>> (a) the seller has exercised all possible care in the preparation and
>> sale of his product, and
>> (b) the user or consumer has not bought the product from or entered
>> into any contractual relation with the seller.

[4]As will be discussed below, Taser contends not only that its product did not
cause the harm here, but *could not* have. Therefore, Taser argues, there can be no
strict liability or any duty to warn about a risk that did not exist.

incapacitated Wilson – effectively restraining Wilson so that he would not be a threat to himself or others."  Taser's Mot. at 14.[5]  It is not clear what Taser would like the Court to take from this representation.  How else the TASER incapacitated Mr. Wilson other than by the electrical charge is not clear.  What is clear is that Taser's filings highlight the presence of a disputed fact on this point, *i.e.*, there is at least some evidence that both probes made contact with Mr. Wilson and an electrical charge passed between them, indeed the very evidence Taser appears to rely on when it claims that the device "functioned as intended."

The evidence of both probes making contact with Mr. Wilson includes statements by defendant John Harris, the police officer who discharged the TASER, and Sergeant Jay Lanphere, who was involved in the pursuit of Mr. Wilson.  Officer Harris testified that the "taser appeared to be immediately effective."  Ex. A-20 to Taser's Mot. [Docket No. 128-24] at 52.  Mr. Wilson's reaction was consistent with Officer Harris' understanding that "a typical response to being tased with the deployment of probes is . . . . 'locking up.'  His arms came right back up to a very clenched, tight position, and his body went very rigid and he fell forward."  *Id.*  Sergeant Lanphere testified that, in addition to the probe that connected with Mr. Wilson's left side, the second "probe appeared to be attached to the lower part of the neck or head on the left side."  Ex. A-21 to Taser's Mot. [Docket No. 128-25] at 40 ("When I rolled him – when we began to roll him over to get his other hand out, that probe, I believe,

_____

[5]More recently, in response to a subsequent motion filed by plaintiffs, Taser represents that "Officer Harris deployed his TASER ECD at Wilson's back, with one TASER probe connecting with Wilson's left axilla (*i.e.*, left armpit), and the other probe arguably impacting the back of Wilson's head."  Docket No. 262 at 3.

came out and was on the ground."); *see id.* at 37 ("When the individual was hit with the taser, what I believed to be a taser hit, the individual immediately dropped to the ground."). In light of the foregoing, the Court is satisfied that there is a genuine dispute of material fact regarding whether both probes made contact with Mr. Wilson and whether an electrical charge passed between the probes.[6]

Taser also argues that the jury will require expert testimony to reach a conclusion regarding proximate causation. Such testimony will be available to it, as the Court has denied, in whole or in part, Taser's motions to exclude the testimony of plaintiffs' experts Dr. David S. Rosenbaum, Dr. Kelly Lear-Kaul, and Dr. John G. Webster. *See* Docket No. 283. Therefore, the jury will not be left to rely solely on the sequence of events in reaching its conclusion on causation. Moreover, Taser's argument that temporal proximity may not be considered as evidence of causation is unavailing. As the Court has already stated in resolving Taser's motion to exclude the testimony of Dr. Rosenbaum,

> to so find would mean that Taser would be entitled to a special causation

---

[6]Taser has proffered the opinion of Andrew Hinz that the probes from this incident did not have any "evidence of scoring and carbon buildup," thereby indicating that no electrical charge passed through them. Ex. A-5 to Taser's Mot. [Docket No. 128-6] at 6. Plaintiffs has filed a motion to exclude that opinion pursuant to Federal Rule of Evidence 702 [Docket No. 252]. The Court need not rule on plaintiffs' objection to that opinion at this time. At this stage, it is sufficient to note that Mr. Hinz does not clearly indicate whether carbon is always, or simply often, present when electricity passes between the probes or explain his methodology for reaching his opinion that probes that make contact with a subject "will have carbon buildup or 'scoring'." Ex A-5 to Taser's Mot. [Docket No. 128-6] at 11; *cf. id.* at 6 ("The presence of scoring and carbon buildup, had it been present, would be consistent with energy being conducted through the probe and delivered to the target."). In short, even assuming for purposes of this motion the admission of his report, a genuine dispute of material fact remains on the question of whether electricity passed through the probes.

rule by which the default assumption is that TASERs cannot cause cardiac arrest, not only as a matter of science, as it would argue to a trier of fact, but as a matter of law, somehow barring consideration of otherwise reliable evidence supporting causation. In an effort to achieve the adoption of such a rule, Taser applies an overly broad and logically flawed interpretation of *post hoc ergo propter hoc*, the logical fallacy that because an event follows another, it was necessarily caused by the earlier event. Taser is correct that application of such false reasoning can blind one to alternative possibilities, many of which will be as or more plausible. In this case, for instance, such a fallacy would be at work if plaintiffs' theory of causation was that, because Officer Harris opened his patrol car door not long before Mr. Wilson's death, the opening of the door must have caused his death.

Taser, however, is seeking to have this Court apply a rule of logic that may also yield inaccurate results, i.e., that sequence is not relevant to causation. That is not necessarily true. This is not a case of mere temporal proximity, but rather of near temporal synchrony: Mr. Wilson collapsed at the same time he was struck by at least one TASER probe. To the extent certain events occur nearly simultaneously – for instance, a baseball bat making contact with a person who immediately falls over – the causal connection between them becomes quite strong.

Order of Feb. 25, 2010 [Docket No. 283] at 14-15.

In sum, the Court is satisfied that a jury, relying upon the evidence of what occurred upon the discharge of the TASER and the expert testimony that has survived Taser's Rule 702 challenges, could conclude that the TASER contributed to Mr. Wilson's death. All of Taser's arguments on causation go to the weight or conclusiveness of that evidence. But those arguments are better directed to the fact finder in this case. *See Bartholic v. Scripto-Tokai Corp.*, 140 F. Supp. 2d 1098, 1113 (D. Colo. 2000) ("The issue of causation is normally one for a jury. Circumstantial evidence is an acknowledged basis for showing causation. Therefore, only in instances where the facts allow reasonable minds to draw but one inference should causation be decided by the court as a matter of law.") (citing *Eggert v. Mosler Safe Co.*, 730 P.2d 895, 898 (Colo. App. 1986) and *Branco Eastern Co. v. Leffler*, 482 P.2d 364, 366 (Colo.

8

1971)).

### B. Unreasonably Dangerous

"A product may be unreasonably dangerous due to a manufacturing defect, a design defect or a failure to warn." *Camacho v. Honda Motor Co., Ltd.*, 741 P.2d 1240, 1247 (Colo. 1987). "A manufacturer may be strictly liable to the user of a product when failure to provide adequate warnings renders the product defective and unreasonably dangerous. The purpose of a warning is to ensure that an otherwise dangerous product is used in a reasonably safe manner." *Id.* at 1248 (citations omitted). Moreover, "[a] manufacturer or seller has a duty to warn of unreasonable dangers associated with the use of its products if the dangers are not obvious to its product users and if [ ] [the manufacturer or seller] knows or should know of them; breach of this duty constitutes negligence." *Staley v. Bridgestone/Firestone, Inc.*, 106 F.3d 1504, 1509 (10th Cir. 1997) (quoting *Davis v. Caterpillar Tractor Co.*, 719 P.2d 324, 328 (Colo. App. 1985)). "Despite the theoretical differences between the two claims, 'Colorado caselaw ... suggests that there need not be a rigid distinction between negligence and strict liability failure to warn concepts.'" *Perlmutter*, 54 F.3d at 663 (quoting *Romero v. International Harvester Co.*, 979 F.2d 1444, 1452 (10th Cir. 1192)).

Furthermore, while courts distinguish failure to warn from design defect as bases for establishing that a product is unreasonably dangerous, the underlying reason for holding a manufacturer liable in each often overlaps conceptually insofar as in both "the product has been manufactured exactly as intended," *Camacho*, 741 P.2d at 1247-48, but something about the product, either its design and means of functioning or the

9

information users have about it, renders it dangerous. *See Barton v. Adams Rental, Inc.*, 938 P.2d 532, 539 (Colo. 1997) ("Failure to warn claims are not sharply differentiated from design defect claims and often arise in the same context. Under Colorado law, 'a failure adequately to warn can render a product otherwise free of defects defective for purposes of strict liability recovery.'") (citations omitted). Indeed, the Colorado Supreme Court considers the existence and sufficiency of warnings in assessing whether a product's design is unreasonably dangerous. The factors include:

> (1) The usefulness and desirability of the product – its utility to the user and to the public as a whole.
>
> (2) The safety aspects of the product – the likelihood that it will cause injury and the probable seriousness of the injury.
>
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
>
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
>
> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
>
> (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Camacho*, 741 P.2d at 1247-48 (citation omitted). This is simply to say that, whether thought of as an independent basis for determining that a product is unreasonably dangerous, or as an aspect of the assessment of a product's design, an inadequate warning can render a product defective. Moreover, at least as presented by the instant motion, this is a case where "'[t]he reasons which impose a duty to warn under [strict liability] also exist where the claim is based on negligence, and, generally, the law

applicable to warnings under [strict liability] are instructive in negligence cases as well.'"
*Perlmutter*, 54 F.3d at 663 (quoting *Halliburton v. Public Serv. Co.*, 804 P.2d 213, 217
(Colo. App. 1990)).

However one conceives of the role a warning plays in the analysis, Taser is not
entitled to summary judgment on the issue of whether the device is unreasonably
dangerous, as plaintiffs have presented a jury question on the sufficiency of the warning
issued for the X26 TASER device.  Taser argues there is no evidence that the TASER
caused Mr. Wilson's death, both under the specific facts of this case as well as a matter
of possibility.  In other words, Taser not only contends that the TASER did not cause a
particular death, but also that it is not capable of so causing a cardiac arrest.  *See*
Taser's Mot. at 16 ("[T]here is no proof that the Device *could* cause Wilson's death and,
thus, that there was a need to warn Officer Harris or Wilson of a purported lethal
characteristic with the Device.").  To the contrary, as already discussed, there is at least
some evidence that the device caused Mr. Wilson's death.

If the jury is convinced that the TASER did cause Mr. Wilson's death, that
implicates the sufficiency of the warning which accompanied the X26 TASER device,
which read:

**WARNING: READ BEFORE USING**

The X26 is a non-lethal weapon.  It is designed to incapacitate a target from
a safe distance without causing death or permanent injury.  While the
extensive medical evidence strongly supports the TASER X26 will not cause
lasting aftereffects or fatality, it is important to remember the very nature of
physical confrontation involves a degree of risk that someone will get hurt or
may even be killed due to unforeseen circumstances and individual
susceptibilities.  Accordingly, the TASER X26 should be treated as a serious
weapon and should only be deployed in situations where the alternative

> would be to use other force measures which carry similar or higher degrees of risk. Law enforcement customers are deployment and tactical experts and will determine all deployment and tactical practices including where the TASER X26 fits in their respective use of force continuum.

Ex. A-14 to Taser's Mot. [Docket 128-18] at 5, ¶ 22 (citing TASER X26 Operating Manual, Version X, Ex. A-30).

The warning could be read to capture the events of this case, insofar as it refers to the risks attendant to physical confrontation under "unforeseen circumstances" and in light of "individual susceptibilities." But these caveats imply that a TASER will not eliminate the risks inherent to the application of force while assuring police officers that the TASER "will not cause fatality" independently of preexisting risks. *See, e.g.*, Ex. A-30 to Taser's Mot. at 1 ("The Taser X26 causes temporary incapacitation and the inability for subjects to catch or protect themselves in a fall. This incapacitation and the resulting fall can be dangerous and even fatal under specific circumstances. For example, someone shot by the X26 in a high place could be seriously injured in a fall or someone shot in a swimming pool could possible drown as they could not swim or support themselves."). Indeed, Taser contends "there is no proof that the Device *could* cause Wilson's death and, thus, that there was a need to warn Officer Harris or Wilson of a purported lethal characteristic with the Device." Taser's Mot. at 16 (emphasis added); *see id.* at 17 n.7 ("Notwithstanding Taser's warnings, TASER had no reason to anticipate Wilson's injuries. TASER never had (and still does not have) any substantiated knowledge that the Device can cause death in the specific scenario presented here."). Taser's own representations highlight how the warning could be read to exclude the possibility of a TASER device contributing to death under the

12

circumstances of this case. Taser will have the opportunity to argue to a jury that the warning was sufficient. The jury may well be convinced, but the present record would permit it to conclude otherwise as well.[7]

Finally, Taser's reliance on the "sophisticated purchaser/learned intermediary doctrine" is misplaced. Taser relies on the Tenth Circuit decision in *Eck v. Parke, Davis & Co.*, 256 F.3d 1013 (10th Cir. 2001), where the court noted that "Oklahoma law recognizes that drug manufacturers cannot be strictly liable merely because of the dangerous propensities of such products." *Id.* at 1017 (citation omitted). Therefore, "[s]uch products, if 'properly prepared, and accompanied by proper directions and warning[s, are] not defective, nor [are they] unreasonably dangerous.'" *Id.* (quoting Restatement (Second) of Torts § 402A, comment k. Even assuming Colorado courts would apply the doctrine to a TASER under appropriate circumstances, the doctrine does not assist Taser under the facts of this case. As an initial matter, Taser's arguments elsewhere in its brief conflict with any contention that its products, like prescription drugs, are "'unavoidably unsafe,'" *Eck*, 256 F.3d at 1017 (citations omitted), in their own right. The police department's relevant expertise, as identified by Taser,

---

[7]Taser has subsequently revised the warnings, the potential relevance of which is the subject of a motion to supplement filed by plaintiffs [Docket No. 258]. At this time, the Court will not take up the issues within that motion. The evidentiary dispute found within the briefing on plaintiff's motion may be renewed at an appropriate time preceding or during trial. For the purposes of resolving the present motion, it is sufficient to note that Taser has not sought to amend or update its representation that "[n]otwithstanding Taser's warnings, TASER had no reason to anticipate Wilson's injuries. TASER never had (and still does not have) any substantiated knowledge that the Device can cause death in the specific scenario presented here." Taser's Mot. at 17 n.7. Nor has it sought to otherwise supplement its motion for summary judgment or the record upon which it requests this Court to rule.

concerns the use of force.  The warnings cited by Taser do not clearly indicate that, even if misused, a TASER device could cause death absent other circumstances inherent to the use of force.  Taser does not, and cannot contend, that the police have the expertise to independently determine, as a matter of electrical engineering and cardiology, the safe and proper use of a TASER device.  *Cf. id.* ("'The reasoning behind the [learned intermediary] rule is that the doctor acts as a learned intermediary between the patient and the prescription drug manufacturer by assessing the medical risks in light of the patient's needs.'") (citation omitted).  In fact, Taser's warning can be read to assure police that they can apply their expertise regarding the inherent risks of force application without fear that the TASER will cause a fatality in a manner distinct from other non-lethal applications of force.  *See* Ex. A-30 to Taser's Mot. [Docket No. 129-7] at 1 ("The X26 is a non-lethal weapon.").  Therefore, the Court need not determine whether the doctrine could apply to a TASER under different circumstances.  It simply has no bearing on the resolution of this matter.

Having found that plaintiffs have proffered sufficient evidence to proceed on their product liability claims against Taser, the Court need not address Taser's arguments that there is insufficient evidence regarding other bases for finding a defect.  The Court does take the opportunity to note, however, that Taser does not address the other potential implication of its impossibility defense.  It is correct that a jury may ultimately be convinced that a TASER device, properly manufactured, cannot cause death under the circumstances of this case.  The jury, however, may also conclude, relying on the evidence regarding the sequence of events and the expert testimony regarding the human heart and how TASERs function, that the TASER was a proximate cause of Mr.

14

Wilson's death.  Such conclusions are not necessarily inconsistent.  Rather, they may lead to a manufacturing defect theory of liability.  *Cf.*, Restatement (Third) of Torts: Product Liability § 3 (1998) ("It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff: (a) was of a kind that ordinarily occurs as a result of product defect; and (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.").[8]  As noted, however, there is no need to resolve such issues at this stage.  For present purposes, it is clear that Taser has not established its entitlement to summary judgment.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant Taser's motion for summary judgment [Docket No. 123] is DENIED.  It is further

**ORDERED** that plaintiffs' motion to supplement [Docket No. 258] is deemed moot without prejudice to renewal of the issues raised therein.

---

[8]*See also* Restatement (Third) of Torts: Product Liability § 3, comment b. (1998) ("Section 3 claims are limited to situations in which a product fails to perform its manifestly intended function, thus supporting the conclusion that a defect of some kind is the most probable explanation.").

DATED March 29, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge