IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Case No.  07-cv-01844-PAB-KLM
       (*consolidated with 07-cv-02248-PAB-BNB*)

WENDY WILSON, as an individual and as the next of kin and personal representative
of Ryan Wilson, deceased, et al.,

       Plaintiffs,

v.

CITY OF LAFAYETTE, et al.,

       Defendants.

_____

**ORDER**
_____

       This matter is before the Court on the combined motion for summary judgment
and dismissal of defendant Lafayette Police Officer John Harris [Docket No. 119] and
motion for summary judgment of defendants Paul Schultz and City of Lafayette [Docket
No. 131].  The motions are fully briefed and ripe for disposition.  For the following
reasons, the Court will grant both motions.

**I.  BACKGROUND**

       On August 4, 2006, Boulder County Drug Task Force Detectives Benjamin Kurtz
and Robert Vesco were conducting surveillance near Hecla Lake in Louisville, Colorado
in an attempt to apprehend the individual illegally growing marijuana plants in the area.
In the early evening, Kurtz and Vesco saw Ryan Wilson near the area where the
marijuana was being grown.  Without identifying themselves as police officers, they

approached Mr. Wilson and asked about the marijuana plants. Mr. Wilson admitted

that the plants were his. Kurtz and Vesco continued to walk toward Mr. Wilson, who

became concerned and ran from the officers. Kurtz and Vesco then identified

themselves as police officers and started chasing Mr. Wilson. They also radioed to

other officers that they were engaged in a foot pursuit of an individual suspected of

illegally growing marijuana. Mr. Wilson attempted to evade the officers by running

across rough terrain for approximately three-quarters of a mile, including crossing at

least one barbed wire fence.

Defendant John Harris, a police officer with the Lafayette, Colorado Police

Department, was on patrol at the time, driving an unmarked police pickup truck. He

was accompanied by a police recruit named Bryan Adair. Officer Harris heard about

the foot pursuit over his police radio and also heard a description of the suspect.

Lafayette Police Sergeant Scott Emerson instructed Harris to assist in the pursuit by

driving to the area where Mr. Wilson was running. Officer Harris arrived to find Mr.

Wilson, who fit the description provided, running across an open field. Officer Harris

drove into the field, with the vehicle lights and siren activated, in an attempt to cut Mr.

Wilson off. He ultimately stopped his truck and chased Mr. Wilson on foot while yelling

at Mr. Wilson that he was a police officer and commanding him to stop.

It is not entirely clear where Mr. Wilson and Officer Harris were relative to each

other at all times before Officer Harris got out of his truck. Officer Harris contends that,

before leaving his truck, he saw a clip on the outside of Mr. Wilson's right front pocket

that he believed secured a knife. Plaintiffs argue that a jury need not believe Officer

Harris' testimony on this point. They point out that Kurtz and Vesco do not recall seeing

a knife clipped to Mr. Wilson's pocket when they first approached him and question whether Officer Harris would have been able to see the clip from the perspectives and distances he claims to have had. Construing the facts in the light most favorable to the plaintiffs, the Court will assume that Officer Harris did not see the knife clip on Mr. Wilson's pocket. In any event, as Officer Harris chased him, Mr. Wilson approached another fence. There is a dispute regarding Mr. Wilson's precise movements at this point, i.e., whether Mr. Wilson stopped, turned to face Officer Harris, and turned to flee again or whether Mr. Wilson simply slowed down as he approached the fence. Officer Harris has testified that Mr. Wilson, while running, turned to his left on more than one occasion to look in Officer Harris' direction.

Furthermore, Officer Harris has stated that Mr. Wilson reached down and placed his hand in the area of his right front pocket. There is no genuine dispute on this point, and no genuine dispute that Mr. Wilson failed to comply with commands that he stop reaching toward his pocket.[1] In addition to Officer Harris' testimony, the record includes the testimony of Mr. Adair, who left the truck and trailed behind Officer Harris during the foot pursuit. He saw Mr. Wilson running awkwardly and heard Officer Harris say to Mr. Wilson "[g]et your hand out of your pocket." Docket No. 120-6 at 14; *see id*. at 49; *id*. at 83 (testifying that Mr. Wilson's hand was "down by the right front of his side" and that

_____

[1]The Court must "determine[] the relevant set of facts and draw[] all inferences in favor of the nonmoving party *to the extent supportable by the record*." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in original). None of the other evidence of record seriously calls Officer Harris' corroborated testimony on this point into doubt. Moreover, as will be discussed below, even if Officer Harris did not see Mr. Wilson reach for his pocket, he would be entitled to qualified immunity because, at a minimum, it was not clearly established at the time that use of a TASER under such circumstances would be a violation of Mr. Wilson's constitutional rights.

Mr. Wilson made a "furtive movement").  Mr. Adair's recollection is that Mr. Wilson began slowing down in the moments before Officer Harris discharged the TASER, but that Mr. Wilson's back remained to Officer Harris, *see* Docket No. 120-6 at 22, 48, testimony largely consistent with Officer Harris' account.  *See* Docket No. 120-7 at 42, 49.

Louisville Police Sergeant Jay Lanphere, who was also pursuing Mr. Wilson, heard Officer Harris make "loud verbal commands," though he could not hear the precise wording from where he was.  Docket No. 120-4 at 31.  According to Sergeant Lanphere, Mr. Wilson turned to confront Officer Harris and then "made an abrupt move" to the right, which Sergeant Lanphere thought was an attempt to start running again. *Id.* at 32.  At that moment, Sergeant Lanphere recalls, Officer Harris deployed the TASER.  *Id.*  In light of the questions surrounding whether Mr. Wilson was looking over his shoulder at Officer Harris, was slowing down, or had stopped and faced him, the Court assumes that Mr. Wilson was running away with his back to Officer Harris at the moment Officer Harris discharged the TASER.[2]  In any event, after Mr. Wilson reached toward his pocket a second time, despite commands not to, Officer Harris discharged an X26 model TASER device in order to subdue Mr. Wilson.

When the trigger on a TASER is pressed, the TASER discharges two probes connected to the device by wires.  If both probes lodge in the skin or clothing of the person targeted, an electrical current flows between the two probes.  This current will

---

[2] *Cf.* Pls.' Response [Docket No. 217] at 20 ("Viewing the facts in a light most favorable to the Plaintiffs requires the Court to accept that a jury could find that Ryan was turning to run away from Harris.  A jury could also find that Harris had no indication that Ryan was carrying a box-cutter pocket knife.").

override the target's central nervous system and cause a loss of muscle control.  There is no serious dispute that one of the TASER probes hit and secured itself to Mr. Wilson's left side.  While there is some dispute regarding whether and where the second probe hit, there is evidence that the second TASER probe struck Mr. Wilson in the back of the head or neck.  In any case, when Officer Harris shot Mr. Wilson with the TASER, Mr. Wilson immediately fell to the ground, face down, and was unresponsive to Officer Harris' commands.

Officer Harris approached Mr. Wilson and took hold of his left arm in an effort to handcuff him.  Sergeant Lanphere approached as well and began assisting Officer Harris.  Officer Harris informed Sergeant Lanphere that Mr. Wilson had been "grabbing at something in his pocket," and then "Officer Harris reached into [Mr. Wilson's] pocket and removed what [Sergeant Lanphere] believed to be a knife in the folded" position.[3] Docket No. 120-4 at 47.  The knife was a small folding "box cutter" with a metal clip. *See* Docket No. 217-13 (photographs of the knife found in Mr. Wilson's pocket).  Within a few moments, the officers noticed that Mr. Wilson was completely unresponsive. They stopped efforts to secure Mr. Wilson and attempted to revive him.  Despite the arrival of emergency medical personnel, attempts to revive Mr. Wilson failed.

Officer Harris, the City of Lafayette, and Lafayette Police Chief Paul Schultz request that the Court grant them summary judgment on the claims that remain against them.  The Court takes up their arguments herein and finds that they are entitled to

---

[3] *Cf.* Docket No. 120-4 at 121 (where Sergeant Jay Lanphere testified to seeing what he believed "was a clip for a knife" on Mr. Wilson's pocket when Mr. Wilson was on the ground).

summary judgment.[4]

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56(c) when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*  Plaintiffs, as the nonmoving parties, "may not rest on [their] pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [they] carr[y] the burden of proof."  *Travis v. Park City Mun. Corp.,* 565 F.3d 1252, 1258 (10th Cir. 2009).

---

[4]The Court addresses their co-defendant Taser International, Inc.'s motion for summary judgment by separate order.  I also take the opportunity to note that plaintiffs have filed motions pursuant to Federal Rule of Evidence 702 to exclude certain expert opinions proffered by defendants.  The Court need not address those motions here, as the Court has not relied upon those expert opinions in determining that defendants Harris, Schultz and the City of Lafayette are entitled to summary judgment.

## III. DISCUSSION

### A. Federal Law Claims

#### 1. *Wrongful Death (Wendy Wilson)*

Ryan Wilson's mother, Wendy Wilson, brings a wrongful death claim pursuant to 42 U.S.C. § 1983, alleging that Officer Harris deprived Mr. Wilson of his constitutional right to be free from a seizure effectuated by use of excessive force.  As an initial matter, the federal remedy for "§ 1983 death cases . . . [is] a survival action, brought by the estate of the deceased victim, in accord with § 1983's express statement that the liability is 'to the party injured.'" *Berry v. City of Muskogee, Okl.*, 900 F.2d 1489, 1506-07 (10th Cir. 1990) (quoting 42 U.S.C. § 1983).[5]  Wendy Wilson is not the representative of Ryan Wilson's estate and, therefore, cannot advance this claim. Moreover, and in any event, the claim is based on allegations that Officer Harris used excessive force in his efforts to arrest Mr. Wilson.  For the reasons outlined below, the Court finds that there was no violation of Mr. Wilson's constitutional rights.[6]

#### 2. *Deprivation of Familial Relationship (Wendy Wilson)*

Wendy Wilson has asserted a claim for deprivation of familial relationship arising

---

[5]*See Cobello v. Pelle ex rel. Boulder County Bd. of Commissioners*, No. 06-cv-02600-MJW-MEH, 2008 WL 926522, at *3 (D. Colo. March 31, 2008) ("[A] wrongful death action is not recognized in the Tenth Circuit as a federal remedy under § 1983.").

[6]Plaintiff Wendy Wilson brings a wrongful death action pursuant to 42 U.S.C. § 1983 against Lafayette Police Chief Paul Schultz and the City of Lafayette.  For the reasons discussed above in relation to Officer Harris, Chief Schultz and the City are also entitled to summary judgment on this claim.

under the due process clause of the Fourteenth Amendment.[7]  "The freedom of intimate association is a substantive due process right, as is its subset, the familial right of association."  *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993).  Defendant Harris argues that plaintiffs have failed to allege, and have pointed to no evidence, that he intended to interfere with Wendy Wilson's relationship with her son.  *See Trujillo v. Board of County Commissioners*, 768 F.2d 1186, 1190 (10th Cir. 1985) (where the Tenth Circuit "conclude[d] that an allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under section 1983").  Plaintiffs do not identify, and the record does not reveal, any evidence supporting this claim.[8]

### 3.  Excessive Force (Jack Wilson)

To succeed on a section 1983 excessive force claim, a plaintiff must establish a deprivation of a federal right by a person acting under color of state law.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).  There is no dispute that Officer Harris was acting under color of state law.  The focus, therefore, is on whether he deprived Mr. Wilson of

---

[7]In her complaint, Wendy Wilson frames the intrusion on her familial relationship as stemming from the "use of unreasonable, unjustified force and violence, causing injuries which resulted in the decedent's death, all without provocation, and all in violation of rights, privileges, and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution."  Ex. B-1 to Notice of Removal [Docket No. 1] at 4-5, ¶ 28.  The Court addresses the reasonableness of the force used by Officer Harris below.

[8]Furthermore, Wendy Wilson claims that the City of Lafayette deprived her of the right to familial relationship.  As discussed above in relation to Officer Harris, there is no evidence supporting the conclusion that Officer Harris intended to interfere with her relationship with Mr. Wilson.  Nor has Wendy Wilson identified any other potential basis for holding the City liable on this claim.

a federal right for which Officer Harris can be held liable.  Jack Wilson, Ryan Wilson's father, claims that Ryan Wilson was subjected to an unreasonable seizure in violation of the Fourth and Fourteenth Amendments.[9]

In response, Harris asserts the defense of qualified immunity.  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Upon a public official's assertion of a qualified immunity defense, plaintiff bears a "heavy burden" under a two-pronged analysis.  *Buck v. City of Albuquerque,* 549 F.3d 1269, 1277 (10th Cir. 2008).  Until recently, the plaintiff was required to "first establish that the defendant's actions violated a constitutional or statutory right."  *Smith v. Cochran,* 339 F.3d 1205, 1211 (10th Cir. 2003) (quoting *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1185 (10th Cir. 2001)).  The determination of whether a violation occurred under the first prong of the qualified immunity analysis turns on substantive law regarding that right. *See, e.g., Casey v. City of Fed. Heights,* 509 F.3d 1278, 1282-83 (10th Cir. 2007).

After establishing that threshold question, the plaintiff had to establish that the right at issue was "clearly established" at the time of the defendant's alleged

_____

[9]The Fourth Amendment applies to state actors by way of incorporation into the due process clause of the Fourteenth Amendment.  *See United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)).  For ease of reference going forward, I will refer only to the Fourth Amendment.

misconduct. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). The Supreme Court recently altered the qualified immunity analysis by holding that the "mandatory, two-step rule for resolving all qualified immunity claims should not be retained." *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 817 (2009). Instead, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson,* 129 S.Ct. at 818.

The Court will first address whether Officer Harris' conduct violated a constitutional or statutory right. The Fourth Amendment provides that the "right of the people to be secure in their persons . . . against unreasonable . . . seizures . . . shall not be violated." U.S. Const. amend. IV. A "seizure" for the purposes of the Fourth Amendment occurs when a government actor terminates one's freedom of movement through means intentionally applied. *Brower v. County of Inyo,* 489 U.S. 593, 596-97 (1989); *Scott v. Harris,* 550 U.S. 372, 381 (2007). There is no dispute here that defendant Harris seized Ryan Wilson. The question is whether that seizure was unreasonable.

A seizure can be unreasonable due to the use of excessive force to effectuate it. "We analyze whether the force used to effectuate an arrest violates an individual's Fourth Amendment rights under the 'objective reasonableness' standard of the Fourth Amendment." *Marquez v. City of Albuquerque,* 399 F.3d 1216, 1220 (10th Cir. 2005) (citing *Graham v. Connor,* 490 U.S. 386, 388 (1989)). "A court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on

the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." *Buck v. City of Albuquerque,* 549 F.3d 1269, 1287-88 (10th Cir. 2008) (quoting *Marquez,* 399 F.3d at 1220). In taking up a motion for summary judgment, once the Court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, the reasonableness" determination becomes "a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in original).

"Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Weigel v. Broad*, 544 F.3d 1143, 1151-52 (10th Cir. 2008) (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted). In regard to the first factor, it is undisputed that Mr. Wilson was suspected of committing a felony. Moreover, Officer Harris testified that he "had been taught that people who grow marijuana tend to be armed . . . [and to] use force." Docket No. 120-7 at 23-24. This factor weighs in favor of Officer Harris.

The Court turns to the degree of threat facing Officer Harris, the factor on which plaintiffs primarily focus their attention. Plaintiffs ask the Court to consider the following non-exclusive factors, which are drawn from a Tenth Circuit case evaluating the use of deadly force: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and

the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). The relevant facts are that Officer Harris knew that Mr. Wilson was fleeing after having been confronted about a marijuana grow. Officer Harris ordered Mr. Wilson to keep his hand away from his pocket, and Mr. Wilson did not comply. Mr. Adair confirms that Mr. Wilson made a furtive movement toward his right pocket. Only about 15 feet separated Officer Harris and Mr. Wilson, and Mr. Wilson was slowing down, thus closing the distance. Finally, Mr. Wilson showed no intention of complying with the police. These factors support Officer Harris' conclusion that application of force – less than deadly force, unlike *Estate of Larsen* –  was justified under the circumstances.[10]

Plaintiffs attempt to avoid summary judgment by claiming that Officer Harris' inconsistent statements create a genuine dispute of material fact. However, "the 'mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Estate of Larsen*, 511 F.3d at 1261. There is no genuine issue here. Plaintiffs fail to identify any material inconsistencies in Officer Harris' statements. As for Mr. Wilson's reaching toward his right pocket, and failing to comply with police orders, the Court finds there to be no genuine dispute of fact.

And to the extent there are discrepancies in the testimony, they are not material.

---

[10]The Court does not take up the more difficult question of whether use of deadly force would have been justified, the question the Tenth Circuit faced in *Estate of Larsen*. *See Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1168 (E.D. Cal. 2008) ("[C]ase law indicates that Tasers are generally considered non-lethal or less lethal force.") (citing cases).

Plaintiffs argue that there is evidence that Mr. Wilson was running away from Officer Harris at the time the TASER was discharged. *See* Pls.' Response [Docket No. 217 19-20. But Officer Harris himself confirms that Mr. Wilson's back was to him in the moments leading up to when Officer Harris discharged the TASER. *See* Docket No. 120-7 at 42, 49. In any event, as already noted, the Court assesses Officer Harris' conduct under the assumption that he never saw a knife clipped to Mr. Wilson's pocket and that Mr. Wilson was running away with his back to Officer Harris, the very inferences plaintiffs have sought the Court to draw. Given Officer Harris' belief that Mr. Wilson was illegally growing marijuana, Mr. Wilson's continued attempts to evade arrest, the shortening distance between them, Mr. Wilson's failure to comply with demands to take his hand away from his pocket, and the very fact that Mr. Wilson was trying to reach into his pocket while in headlong flight from the police, Officer Harris was not required to wait until Mr. Wilson turned to confront him in order to protect himself. *Estate of Larsen*, 511 F.3d at 1260 ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'") (citation omitted).

Even putting to one side plaintiffs' attempts to create a genuine dispute of material fact regarding the threat posed by Mr. Wilson, it is undisputed that he was suspected of committing a felony and persisted, for some time and with a great effort, in his attempts to evade arrest by flight, the third factor identified by *Graham*. Plaintiffs contend that the Tenth Circuit's decision in *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007), establishes that the use of a TASER in these circumstances was

unreasonable. Plaintiffs identify nothing in *Casey* raising any concerns about the objective reasonableness of Officer Harris' conduct in light of these circumstances.[11] They would be hard pressed to do so. Unlike in this case, the *Casey* court was "faced with the use of force – an arm-lock, a tackling, a Tasering, and a beating – against one suspected of innocuously committing a misdemeanor, who was neither violent nor attempting to flee." *Id.* at 1282 (noting that Mr. Casey was never told he was under arrest or otherwise "given . . . a chance to submit peacefully to an arrest"). In that light, the officers' conduct was excessive under the Fourth Amendment.[12] *Id.*

Here, by contrast, Mr. Wilson was attempting to flee, thus justifying "increased force." *Casey*, 509 F.3d at 1282.[13] Mr. Wilson was suspected of a felony and, at a

_____

[11]Plaintiffs' own description of the holding in *Casey* – "use of a TASER . . . could not be justified when the severity of the crime was minor, where there was no threat to the safety of the officers or others, and where there was no active resistance to arrest or an attempt to evade arrest by flight," Pls.' Response [Docket No. 217] at 17 – highlights the stark differences between that case and the one before this Court.

[12]*See Casey*, 509 F.3d at 1282-83:
This conclusion is reinforced by comparison with our recent decision in *Mecham v. Frazier*, 500 F.3d 1200 (10th Cir. 2007). There, we held that officers had not violated the Fourth Amendment in using pepper spray to arrest a woman who was uncooperative during a traffic stop. Although we acknowledged that the "unfortunate" conduct of the officers was possibly wrong in hindsight, we held that it was justified by two of the three factors under *Graham* – safety concerns and Ms. Mecham's resistance to arrest. *Id.* at 1204-06. In particular, Ms. Mecham repeatedly ignored the officers' warnings that she would be arrested, thus turning "what should have been a routine encounter . . . into a fifty-minute ordeal." *Id.* at 1204. Even when given one last warning to get out of her car or face arrest, she refused. She also remained in control of her car on a "narrow shoulder of a busy interstate highway," and thus may have been "a danger to herself or others." *Id.* at 1205.

[13]*See Miffin v. Bradshaw*, No. 8:08-cv-592-T-33EAJ, 2009 WL 5067750, at *5 (M.D. Fla. Dec. 15, 2009) ("Both officers could have reasonably believed that Miffin

minimum, failed to comply with commands to stop reaching toward his right pocket.[14]

*See Schumacher v. Halverson*, 467 F. Supp. 2d 939, 951 (D. Minn. 2006) (concluding

that a single TASER discharge to effectuate compliance with multiple orders to

accompany the officer "was measured, proportionate, and objectively reasonable").

Less than twenty feet separated Officer Harris from Mr. Wilson as the two approached

a fence. In the moment Officer Harris had to make a decision, it was objectively

reasonable for him to decide to discharge his TASER once to subdue Mr. Wilson.[15]

Plaintiff has identified, and the Court is aware, of no authority for the proposition that a

single TASER discharge in such circumstances is excessive. *See Oliver v. City of*

*Orlando*, 574 F. Supp. 2d 1279, 1285 (M.D. Fla. 2008) (where the court, before

determining whether subsequent TASER discharges were excessive, found that,

"[g]iven Oliver's unusual conduct, it was not . . . unreasonable for [the officer] to employ

her taser, without warning, in order to subdue Oliver and gain control of him"); *see also*

---

posed a threat to their safety since he purposely avoided their efforts to control his movement in order to approach him and they had no way of knowing whether or not he was armed. Miffin actively attempted to flee and evade the officers.").

[14]*See Magee v. City of Daphne*, No. 05-0633-WS-M, 2006 WL 3791971, at *1 n.6 (S.D. Ala. Dec. 20, 2006) ("The critical inquiries for summary judgment purposes are what the involved officers knew, what they observed, and what they had reason to believe.").

[15]Plaintiffs contend there is evidence that Officer Harris held down the trigger so as to permit the electrical charges to pulse for 6 seconds, longer than the 5 seconds that normally follows a single discharge. *See* Pls.' Response at 20. Regardless of whether it was 5 or 6 seconds, Officer Harris claims he discharged the TASER in order to subdue Mr. Wilson and stopped discharging it upon being satisfied it was effective. *See* Docket No. 120-7 at 54-55. He recalls that it "did appear that the taser had gone past five seconds." *Id.* at 54. The Court finds that any dispute in this regard, in light of the small difference in time, is immaterial.

*Zivojinovich v. Barner*, 525 F.3d 1059,1073 (11th Cir. 2008) ("We have previously held that in a 'difficult, tense and uncertain situation' the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force.") (citing *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004)); *Gruver v. Borough of Carlisle*, No. 4:CV 05-1206, 2006 WL 1410816, at *5 (M.D. Pa. May 19, 2006) (concluding it was objectively reasonable for officer to discharge a TASER three times in order to restrain an unarmed individual "who appeared to be intoxicated or in some state of distress, in order to protect the Plaintiff himself, as well as others and themselves"); *cf. Bryan v. McPherson*, 590 F.3d 767, 780 (9th Cir. 2009) (concluding that use of a TASER, described as an "intermediate level of force," was excessive because the plaintiff "never attempted to flee," "was clearly unarmed and was standing, without advancing in any direction" and the officer was "approximately twenty feet away observing [plaintiff's] stationary, bizarre tantrum" in what was "a tense, but static, situation"); *Asten v. City of Boulder*, 652 F. Supp. 2d 1188, 1203-04 (D. Colo. 2009) (use of a TASER unreasonable where plaintiff had not committed a crime, did not pose a threat to the officers or third persons, and never actively resisted or attempted to evade arrest).  The undisputed facts provide no support for the argument that "a lesser amount of force – or a verbal command," *Casey*, 509 F.3d at 1286, could have ensured Mr. Wilson's safe compliance.  In sum, the Court concludes that Officer Harris' conduct was justified by "the severity of the crime at issue," the threat posed to his safety, and Mr. Wilson's "actively . . . attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.

Having found that Officer Harris did not violate Mr. Wilson's constitutional rights, the Court is not required to reach the question of whether the right identified by plaintiffs was "clearly established" at the time.[16] However, in the alternative, even if Officer Harris did violate Mr. Wilson's constitutional rights, plaintiff has failed to establish a violation of a clearly established right.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Casey,* 509 F.3d at 1283-84 (quoting *Saucier,* 533 U.S. at 202); *see also Anderson v. Creighton,* 483 U.S. 635, 640 (1987). As the Tenth Circuit has pointed out, the "difficult part of this inquiry is identifying the level of generality at which the constitutional right must be 'clearly established.'" *Casey*, 509 F.3d at 1284. Plaintiffs are correct that it was clearly established at the time that individuals had a right to be free of excessive force. *See Graham*, 490 U.S. at 395. But "the Supreme Court has held that *Graham*'s 'general proposition . . . is not enough' to turn *all* uses of excessive force into violations of clearly established law." *Casey*, 509 F.3d at 1284 (quoting *Saucier*, 533 U.S. at 201-02). "In other words, the fact that it is

_____

[16]Jack Wilson also contends that the City of Lafayette's failure to adequately train Officer Harris, and the existence of a policy or custom encouraging police officers to disregard use of force policies, resulted in the deprivation of Mr. Wilson's constitutional rights. "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood, Kansas*, 997 F.2d 774, 782 (10th Cir. 1993) (citing, *inter alia*, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Because the Court has found no underlying constitutional violation by Officer Harris, Jack Wilson's section 1983 claims against the City also fail. Nevertheless, the Court finds that, under the facts of this case – indeed, even assuming Mr. Wilson never reached for his pocket – Officer Harris is entitled to qualified immunity on the question of whether the right was "clearly established."

clear that any unreasonable use of force is unconstitutional does not mean it is always clear *which* uses of force are unreasonable." *Id.*

"A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Gann v. Cline,* 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting *Anderson v. Blake,* 469 F.3d 910, 914 (10th Cir. 2006)) (internal quotation marks omitted).[17]  However, "contrary authority from other circuits does not preclude a finding that the law in this circuit was clearly established, if the contrary authority can be distinguished."  *Currier v. Doran,* 242 F.3d 905, 923 (10th Cir. 2001).

Furthermore, factual novelty alone will not automatically provide a state official with the protections of qualified immunity.  *See Casey,* 509 F.3d at 1284 (noting that in the Fourth Amendment context, "there will almost never be a previously published opinion involving exactly the same circumstances"); *Blake,* 469 F.3d at 914 ("[A] general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question, even though the very action in question has

---

[17]In *Prison Legal News, Inc. v. Simmons*, 401 F. Supp. 2d 1181, 1189-90 (D. Kan. 2005), the court noted that the quoted language "from other circuits" appears to be a misquote of the Tenth Circuit's decision in *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992), where the court used the language "from other courts."  That misquote first appeared in *Murrell v. School District No. 1, Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999) and has since appeared repeatedly in Tenth Circuit cases.  The *Prison Legal News* court, though concluding that the "misquote was merely a scrivener's error" and was not meant as a substantive change to the legal standard, added that "the fact that this error has not been discussed in a reported case from the Tenth Circuit suggests the error may not be very significant."  401 F. Supp. 2d at 1191.  "In other words, although the circuit may be willing to consider cases from courts beyond the federal appellate courts, the focus should normally be on cases decided by other circuits."  *Id.*

not previously been held unlawful." (internal quotation marks and alteration marks omitted)).[18] The Tenth Circuit employs a "sliding scale" in identifying clearly established law: "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey,* 509 F.3d at 1284 (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004)).

Qualified immunity provides "ample room for mistaken judgments," *Malley v. Briggs*, 475 U.S. 335, 343 (1986); *cf. Casey*, 509 F.3d at 1286 ("[A]n officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are 'no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as she did.") (quoting *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1197 (10th Cir. 2001)). "[D]efendants are required to make 'reasonable applications of the prevailing law to their own circumstances.'" *Currier*, 242 F.3d at 923 (quoting *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999)). Moreover, even if other police officers may have taken a different approach in the same circumstances, that does not clearly establish that Officer Harris' approach was objectively unreasonable. *See Whitington v. Lawson*, No. 06-cv-00759-LTB-CBS, 2009 WL 3497791, at *3 (D.Colo. Oct. 29, 2009) ("Qualified immunity exists so long as reasonable officials in the same situation as the defendants could disagree on the appropriate course of action to follow.") (citing *Holland*, 268 F.3d at 1186). The Court

---

[18]*See Buck,* 549 F.3d at 1290 ("The law is clearly established either if courts have previously ruled that materially similar conduct was unconstitutional, or if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct at issue." (internal quotation marks and alteration marks omitted)).

finds that plaintiffs have not established that Officer Harris "must have known that he could not behave as [plaintiffs] allege[] that [he] did." *Casey*, 509 F.3d at 1284.

Although it was decided after the events at issue, the decision in *Casey* is instructive insofar as the Tenth Circuit stated that it did "not know of any circuit that has upheld the use of a Taser immediately and without warning against a misdemeanant like [the plaintiff]." *Casey*, 509 F.3d at 1286. The facts of this case are materially different from such a situation. Ryan Wilson was suspected of a felony, had been fleeing the police for approximately three quarters of a mile across rough terrain, and, at a minimum, failed to comply in the face of obvious police efforts to detain him.

Plaintiffs have identified no cases or clearly established principles that would have put Officer Harris on notice that his conduct, in light of these circumstances, was a violation of clearly established law, and the Court is aware of none. Instead, they rely upon *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991), and *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001). Those cases, from outside the Tenth Circuit, are distinguishable. In *Yates*, the Sixth Circuit concluded that the plaintiff enjoyed a clearly established "right not to be shot [with a firearm] by an officer unless he posed a threat to the officer or to others." *Yates*, 941 F.2d at 447. This provides little guidance to an officer who decides to use a TASER on a suspected felon who has continued to flee from numerous police officers and refused to comply with demands to submit before the TASER was discharged.

The *Deorle* court did consider the use of a less lethal form of force. There, the police shot a "beanbag round" into the face of an emotionally disturbed individual,

causing serious injury.  In concluding that the government's interest in using such force

was insubstantial, the Ninth Circuit considered, *inter alia*, that, at the time he was shot,

the plaintiff could not escape the area because of roadblocks.  *Deorle*, 272 F.3d at

1281.  Nor did he ever attempt to flee.  *Id.* at 1282.  Moreover, the court noted that "the

crime being committed, *if any*, was minor and the danger to [the officer] and others

appears to have been minimal, as was the risk of flight."  *Id.* (emphasis added).  Here,

when confronted by police officers, Mr. Wilson fled and persisted in fleeing across more

than one fence and across rough terrain.  He showed no intention of complying with the

police, ignoring numerous requests to stop.  *Cf. id.* (noting "Deorle's compliance with

the prior commands of the officers").  It would not have been clear to a reasonable

police officer from the reasoning of the Ninth Circuit decision that his conduct was an

unreasonable use of force.  *See id.* at 1288 (concluding that the officer's response,

"even if excessive, even if mistaken, was not an unreasonable mistake") (Silverman, J.,

dissenting).

Finally, plaintiffs cite *Allen v. Muskogee, Okl.*, 119 F.3d 837, 840-41 (10th Cir.

1997), for the proposition that the "right to be free from excessive force that might

cause serious bodily injury was well established in the 10th Circuit at the time of the

events in question."  Pls.' Response [Docket No. 217] at 23.  That case states a broad,

and undisputed, proposition that is of little help in resolving whether it was clearly

established that Officer Harris' particular use of force was excessive.

For these reasons, the Court concludes that Officer Harris did not violate Mr.

Wilson's constitutional rights and, even assuming he had, the right was not clearly

established at the time.

### 4. Lack of Probable Cause (Jack Wilson)

Jack Wilson brings a claim alleging that Officer Harris did not have probable

cause to arrest Mr. Wilson. Plaintiffs offer no response to defendant Harris' argument

that he had probable cause to arrest Mr. Wilson. In light of the failure to oppose the

motion on that ground, and being satisfied that there is not "room for a difference of

opinion" on the existence of probable cause in light of the undisputed facts in this case,

*Bruner v. Baker*, 506 F.3d 1021, 1028 (10th Cir. 2007),[19] the Court will grant summary

judgment to defendant Harris on Jack Wilson's seventh claim for relief.

### B. State Law Claims

Officer Harris argues that Wendy Wilson does not have standing to bring her

battery and negligence claims because she is not the personal representative of Mr.

Wilson's estate. Jack Wilson is the personal representative but has not brought a

battery claim. The plaintiffs, however, cite to allegations in both complaints and attempt

to advance the claim jointly. Therefore, and despite motion's request for dismissal for

lack of standing and failure to state a claim, the parties have conducted discovery on all

issues relevant to this claim and have presented the Court with a sufficient record to

resolve this issue on summary judgment.

The Court already has determined that Officer Harris' use of force was

objectively reasonable. Plaintiffs have not shown that Officer Harris failed to use

---

[19]*See Everson v. Leis*, 556 F.3d 484, 499 (6th Cir. 2009) ("In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.").

"reasonable and appropriate physical force . . . . [t]o effect an arrest . . . ," Colo. Rev.

Stat. § 18-1-707(1), or in some other manner acted in a "willful and wanton" manner.

Colo. Rev. Stat. § 24-10-118(1); *cf.* Colo. Rev. Stat. § 24-10-110(5) (requiring all

allegations that a public employee's conduct was willful and wanton be supported by

their "specific factual basis").  Moreover, plaintiffs have failed to identify any other basis

for holding Officer Harris liable on these state law tort claims.  Officer Harris is,

therefore, entitled to summary judgment on Wendy Wilson's battery and negligence

claims.[20]

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant Lafayette Police Officer John Harris' combined motion

for summary judgment and dismissal [Docket No. 119] is GRANTED.  It is further

**ORDERED** that the motion for summary judgment of defendants Paul Schultz

and City of Lafayette [Docket No. 131] is GRANTED.  It is further

**ORDERED** that all claims against defendants John Harris, Paul Schultz, the

Lafayette Police Department, and the City of Lafayette are DISMISSED.

---

[20]Jack Wilson also brings a state law wrongful death claim.  In response to Officer Harris' motion, plaintiffs offer no clear response specific to this claim.  The claim, like the others, however, arises out of allegations that Officer Harris was unjustified in his use of force.  The Court has concluded he was not, thus entitling him to summary judgment on all plaintiffs' claims.

DATED March 31, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge