IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Case No. 07-cv-01844-PAB-KLM
    (*consolidated with 07-cv-02248-PAB-BNB*)

WENDY WILSON, as an individual and as the next of kin and personal representative
of Ryan Wilson, deceased, et al.,

      Plaintiffs,

v.

TASER INTERNATIONAL, INC.,

      Defendant.

_____

**ORDER**
_____

       This case arises out of the death of Ryan Wilson after a police pursuit. The

pursuit ended when a police officer shot Mr. Wilson with a TASER and, shortly

thereafter, Mr. Wilson died. In defense of the claims against it, defendant Taser

International, Inc. ("Taser") seeks to introduce expert testimony by Andrew Hinz.

Plaintiffs ask the Court to exclude that testimony pursuant to Federal Rule of Evidence

702 [Docket No. 252]. The motion is fully briefed and ripe for disposition.

## I. BACKGROUND

       On August 4, 2006, two undercover officers from the Boulder County Drug Task

Force approached Ryan Wilson in a field in Louisville, Colorado. Upon realizing that he

was speaking to police officers, Mr. Wilson fled. The officers chased him for

approximately three-quarters of a mile across rough terrain and multiple fences. Officer

John Harris arrived by police vehicle during the pursuit and quickly identified Mr. Wilson from a description he received from the other officers. He also began pursuing Mr. Wilson by foot. Mr. Wilson then approached another fence. There is a dispute regarding Mr. Wilson's precise movements at this point, i.e., whether Mr. Wilson stopped, turned to face Officer Harris, and turned to flee again or whether Mr. Wilson simply slowed down as he approached the fence. In any event, at this stage of the encounter, Officer Harris discharged an X26 model TASER device at Mr. Wilson.

When the trigger on a TASER is pressed, the TASER discharges two probes connected to the device by wires. If both probes lodge in the skin or clothing of the person targeted, an electrical current flows between the two probes. This current will override the target's central nervous system and cause a loss of muscle control. There is no dispute that one of the TASER probes hit and secured itself to Mr. Wilson's left side. Taser, however, contends that there is no evidence that the second probe made contact with Mr. Wilson, thus permitting an electrical current to pass between the two probes. In any case, at the same time Officer Harris shot Mr. Wilson with the TASER, Mr. Wilson immediately fell to the ground, face down, and was unresponsive to Officer Harris' commands.

Taser now seeks to introduce the expert testimony of Andrew Hinz in support of its argument that no electrical charge passed between the TASER probes. Plaintiffs filed the present motion to exclude Mr. Hinz's testimony pursuant to Federal Rule of Evidence 702.

## II. FEDERAL RULE OF EVIDENCE 702

Federal Rule of Evidence 702 provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  As the rule makes clear, while required, it is not sufficient, that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area.  Rather, the Court must "perform[] a two-step analysis."  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After "determin[ing] whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render an opinion," *id.* (quoting Fed. R. Evid. 702), the specific proffered opinions must be assessed for reliability.  *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based upon sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods . . . to the facts of the case").

Rule 702 "imposes on the district court a gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).  To execute that function, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a

particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). When assessing reliability, "the court may consider several nondispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *103 Investors I*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94). These considerations are not exhaustive. Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

While defendant, as the proponent of the challenged testimony, has the burden of establishing admissibility, its proffer is tested against the standard of reliability, not correctness; Taser need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008).

In sum, expert testimony must be excluded if the expert is unqualified to render an opinion of the type proffered, if the opinion is unreliable, if the opinion will not assist the trier of fact, or if the opinion is irrelevant to a material issue in the case.

## III. DISCUSSION

Taser seeks to admit the following three opinions provided by Mr. Hinz in his

report:

1. Probe A has no evidence of carbon buildup, there is no evidence of scoring of the probe's surface at the air gap, and there is no evidence of melting of the wire insulation consistent with the completion of the circuit and the target receiving electrical energy.

2. Probe B has no evidence of carbon buildup, there is no evidence of scoring of the probe's surface at the air gap, and there is no evidence of melting of the wire insulation consistent with the completion of the circuit and the target receiving electrical energy.

3. The intended target of the firing from the TASER cartridge did not receive TASER energy via the probes. Therefore, the target did not receive the TASER electrical pulses via the probes and wires examined.

Docket No. 252-2 at 17.

### A. Qualifications

Mr. Hinz states that his "opinions were developed using the disciplines of

electrical engineering, biomedical engineering, scientific methods, mathematics, and

physics and are to reasonable, or higher, degree of professional and scientific certainty

or probability." Docket No. 252-2 at 4. Taser, however, fails to identify any training or

experience of Mr. Hinz in these disciplines. His undergraduate education was in Office

Information Systems, and his work experience prior to his employment with Taser does

not indicate any training, experience, or education in these fields. Rather, the

experience upon which he relies upon is that as a TASER Field Support Technician and

Law Enforcement Technical Coordinator. In those positions, he has "personally

inspected and verified TASER device function for over 5,000 ADVANCED TASER M26

. . . and TASER X26 . . . devices." Docket No. 252-2 at 5. Of particular relevance to his

opinions in this case, Mr. Hinz has "inspected over 100 probe and wire samples from

training classes where a TASER ECD was discharged into a human target from zero . .

. to twenty . . . seconds to observe the physical changes to the probes and wires," and

has "performed probe and wire analysis for twelve . . . investigations where a TASER

probe sample was presented for analysis to determine whether energy was transferred

through the wires and probes indicating a completed circuit." Docket No. 252-2 at 5.

At his deposition, Mr. Hinz testified as follows regarding his experience inspecting

TASER probes and wires:

> If the probes are provided, we have been able to come up with an analysis
> where we actually look at the wire and then, based on firing different probes
> at different durations, we can determine the amount of scoring and the
> melting of the insulation and scoring and carbon buildup on that probe and/or
> the wire to determine exactly how long that device was fired for.

Docket No. 252-1 at 5, Hinz Depo. at 14, ll. 16-22. Mr. Hinz learned to conduct this

analysis from working "closely with engineering." Docket No. 252-1 at 5, Hinz Depo. at

15, l. 15. It was "one of the projects that [he] decided to take on [his] own." Docket No.

252-1 at 5, Hinz Depo. at 17, ll. 13-14; *see* Hinz Depo. at 17, ll. 14-15 ("I got a

microscope and started analyzing probe samples."). Gaining specialized knowledge

through experience can be sufficient. *See* Fed. R. Evid. 702.

### B. Methodology

While Mr. Hinz may have ample experience in the experiments he describes,

that does not answer the question of whether those experiments constitute, both

generally speaking and as applied to the facts of this case, a reliable methodology. Mr.

Hinz claims to have reached his opinions "using one or more qualitative and

6

quantitative research methodologies, in addition to [his] education, training, experience, investigation, and literature review." Docket No. 252-2 at 4. The only methodology he specifically cited in his report, however, is the probe and wire inspections. *See* Docket No. 252-2 at 6-11.

Mr. Hinz claims experience "inspect[ing] over 100 probe and wire samples from training classes where a TASER ECD was discharged into a human target from zero (0) to twenty (20) seconds to observe the physical changes to the probes and wires." Docket No. 252-2 at 5. He "also performed probe and wire analysis for twelve (12) investigations where a TASER probe sample was presented for analysis to determine whether energy was transferred through the wires and probes indicating a competed circuit." Docket No. 252-2 at 5. In this case, he opines that the "intended target . . . did not receive TASER energy via the probes." Docket No. 252-2 at 17. He implies that, in *all* cases when *any* electricity passes through the probes for a certain duration, scoring or carbon buildup is left behind. He also states that the "presence of scoring and carbon buildup, had it been present, would be consistent with energy being conducted through the probe and delivered to the target." Docket No. 252-2 at 7. However, the factual support for the opinion that the absence of scoring and carbon buildup is inconsistent with energy being conducted through the probe apparently resides in the results of the prior tests. Those results and their relevance to the inspection of the probes at issue in this case have not been revealed, and the Court declines Taser's invitation to take Mr. Hinz's word for it. *See* Fed. R. Evid. 702 advisory cmt. notes ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert*

or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  Without the data supporting Mr. Hinz's opinion, he will not be permitted to testify to the opinion that no energy passed through the probes.[1]

In his report, Mr. Hinz also includes the opinion that the steel probe of the TASER could not have broken by hitting Mr. Wilson.  *See* Docket No. 252-2 at 9 ("A human target is not hard enough to break the dart tip.").  The only support he offers for this opinion are the general observations that "[i]t takes a substantial amount of force to break the dart head" and "Probe A hit an object that was extremely hard."  Docket No. 252-2 at 9.  In a declaration attached to Taser's response to plaintiffs' Rule 702 motion, Mr. Hinz declares that he relied on data regarding the relative hardness of the TASER dart and a human skull to reach his conclusion.  *See* Docket No. 273-2 at 2, ¶¶ 7-10.  He also recounts that neither he, nor anybody else at Taser, has ever seen a dart tip broken from contact with a human target or synthetic bone structure.  *See* Docket No. 273-2 at 2, ¶ 11.  These latter two bases were not cited in his report, and the Court finds no support for the assumption that Mr. Hinz was familiar with data regarding the relative hardness of the materials at issue.  Mr. Hinz does not identify any qualifications he has to offer opinions regarding materials or ballistics.  Nor does he cite any methodology he used to apply the relevant data regarding material hardness to his

---

[1]Nor may he testify that there was no carbon buildup or scoring.  Although Mr. Hinz's experience and the nature of the testing might permit him to offer such an opinion, it is not relevant in the absence of some connection being drawn to the electrical charge.  Taser was free to supply the factual basis for Mr. Hinz's conclusion, but chose not to.  In so doing, it has failed to meet its burden of demonstrating the reliability of Mr. Hinz's opinion regarding the lack of an electrical charge.

determination of whether the steel probe could break upon contact with human bone. Mr. Hinz says nothing about relative material thickness and shape and fails to address the potential effect of the probe's angle and velocity upon contact. In short, he offers no reliable basis for an expert opinion and would not be able to assist the jury in determining what relevance the sole data he cites has to the question of whether the probe could break upon contact with Mr. Wilson. Accordingly, that opinion will also be excluded.

Because the Court will exclude Mr. Hinz's opinion, the rebuttal report of Dr. John G. Webster [Docket No. 167-18] will also be excluded as moot.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that plaintiffs' Rule 702 motion to preclude the testimony of Andrew Hinz [Docket No. 252] is GRANTED. It is further

**ORDERED** that the rebuttal report of Dr. John G. Webster [Docket No. 167-18] is excluded as moot.


DATED August 16, 2010.

BY THE COURT:


s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge